**SIGNED THIS: March 02, 2011**

_____

**THOMAS L. PERKINS**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**

---

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **LONNIE BUTLER,** | ) | No.  07-81047 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| **LONNIE BUTLER,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 09-8101 |
| | ) | |
| **THE NATIONAL BANK,** | ) | |
| Defendant. | ) | |

### O P I N I O N

This matter is before the Court after trial on the Amended Motion filed by the

Debtor, Lonnie Butler (DEBTOR), to find The National Bank (BANK) in contempt for its

wilful and intentional violation of the discharge injunction pursuant to section 524 of the

Bankruptcy Code.  This case raises the difficult issue of defining the limits on a secured

creditor's enforcement of its liens after bankruptcy.

## BACKGROUND

The DEBTOR was engaged as a self-employed subcontractor in the business of residential construction, remodeling and landscaping. In the early months of 2005, the DEBTOR purchased several different pieces of equipment with financing from the BANK, granting the BANK a security interest in the collateral. On January 28, 2005, the DEBTOR purchased a 1988 Vermeer Backhoe with a loan from the BANK, signing a note for $7,394.65 and granting a security interest to secure payment of the note. In February, 2005, the DEBTOR purchased a 1975 John Deere Dozer and a 2004 Trailer. The purchase was financed through a loan from the BANK in the principal amount of $21,321.42 and the DEBTOR granted the BANK a security interest. On March 18, 2005, the BANK financed the purchase of a 1968 Chevy C50 and a 2005 Lincoln ARC welder, borrowing $5,265 from the BANK. On April 5, 2005, the BANK financed the purchase of a new bulldozer tractor, loaning the DEBTOR $11,165.64. On May 31, 2005, the BANK loaned the DEBTOR $4,310, taking a security interest in a 1971 Chevrolet C20 and a 1984 Chevrolet C30.

The DEBTOR made only a few payments on some of the loans. The loans went into default, and the BANK sought repossession of the equipment in September, 2005. The repossession service hired by the BANK failed to recover any of the collateral.

**State Court Proceeding**

The BANK filed suit against the DEBTOR on May 26, 2006, pleading detinue and breach of contract, seeking to recover possession of the collateral or, alternatively, its value.[1] The state court set a hearing on the issuance of a writ of replevin on June 15, 2006.

---

[1] Detinue is a common law cause of action recognized in Illinois that is substantially similar to the statutory cause of action for replevin. Like replevin, the primary remedy is return of property wrongfully withheld, although a money judgment for the value of the property not returned is available as a conditional, secondary remedy. *See Relational Funding Corp. v. Siemens Information & Communications Networks, Inc.,* 2000 WL 1222126 (N.D.Ill. 2000).

The DEBTOR failed to appear and a judgment in detinue was entered by the court providing that if the DEBTOR failed to return nine specific items of collateral to the BANK within seven days, the BANK could recover $51,672.95 as damages for the value of the property, plus $500 for its wrongful detention.

The BANK filed a motion for rule to show cause on September 6, 2006, for DEBTOR'S failure to comply with the June 15, 2006, judgment. When the DEBTOR failed to appear at the hearing held in October, the court issued an arrest warrant on November 15, 2006, setting bond at $500 cash. The DEBTOR was arrested in early January, 2007, and posted the $500 cash bond. The DEBTOR was ordered to appear at a hearing set for February 5, 2007. On that date, the BANK filed a motion for turnover, alleging that no payments had been made on the judgment and seeking application of the bond to the judgment and a second order for the DEBTOR to turn over the collateral. The DEBTOR appeared at that hearing with his attorney, Thomas Blade, and a continued hearing was set for February 21, 2007. The court's docket entry on February 16, 2007, reads: "Mittimus Stayed til noon on Wed 2/21/07 Defendant FTA on Rule, Bond is set at 5000.00 Cash no 10 percent because Deft fails to appear before and appears to be hiding collateral Deft to appear 900 AM on 2/21/07 before MAV."

At the show cause hearing on February 21, 2007, at which the DEBTOR was represented by Attorney Blade, an order was entered requiring the DEBTOR to meet with a representative of the BANK at his residence and to take the BANK representative to all "other locations" where he "is holding property for the purpose of surrendering any and all property identified" in the order of June 15, 2006. The order further provided that the

DEBTOR disputed the BANK'S right to possession of three items and an evidentiary hearing was set for April 16, 2007, to address that issue.  When the representative of the BANK went to the DEBTOR'S residence, he was only able to retrieve three pick up trucks. The DEBTOR neither surrendered nor disclosed the location of any of the other items of collateral.

Two days later, the BANK filed a second motion for rule to show cause, requesting that the DEBTOR be held in contempt for his failure to comply with the order entered February 21, 2007.  The second motion was heard on February 23, 2007, without the DEBTOR'S appearance.  At the conclusion of the hearing, the court issued a show cause order requiring the DEBTOR to appear on February 26, 2007.  The order entered on February 26, 2007, after the hearing at which the DEBTOR and his attorney appeared, required the DEBTOR to deliver three designated items to an auctioneer by March 5, 2007, specifically referring to those items as "set forth on attached Exhibit A and designated 'D'." Exhibit A, attached to the order, contained the following information:

    D -   1988 M475 Vermeer Backhoe, Serial Number 212
    H -   1976 John Deere 450 Dozer, Vehicle Identification Number 032700T
    H -   2004 Top Hat 25' Trailer, Vehicle Identification Number 4R7G030224T052500
    H -   1968 Chevrolet C50, Vehicle Identification Number CE538S118876
    D -   2005 Lincoln Electric ARC & MIG Welder, Model Number K1419-4, Serial
              Number U1040611323
    P -   1983 Ford F700, Vehicle Identification Number 1FDXK84N7DVA45499
    D -   ~~1988 GMC, Vehicle Identification Number 1GDG6D1B5JV528511~~ (sic)
    P -   1971 Chevrolet C20, Vehicle Identification Number CE24IJ624735
    P -   1984 Chevrolet C30, Vehicle Identification Number 1GCHC34W8EJ124092

              D = Shall be delivered w/in 7 days
              H = Subject to hearing on April 16, 2007, at 9:30
              P = Plaintiff is in possession

The 1988 GMC had been previously sold in enforcement of a towing company's storage

lien.  The order directed that the DEBTOR'S failure to comply with the order would be heard on April 16, 2007, as an "indirect civil contempt proceeding."

The DEBTOR failed to appear at the hearing on April 16, 2007, but his attorney appeared on his behalf.  Applying the February 26 order, the court conducted the April 16 hearing as one for the BANK to offer evidence to prove up the indirect civil contempt of the DEBTOR.[2]  Based upon the undisputed testimony of the BANK'S assistant collection manager, the court made several findings.[3]  First, the court determined that the BANK had valid, unreleased liens on the three items of disputed collateral, the 1976 John Deere 450 Dozer, the 2004 Top Hat trailer, and the 1968 Chevrolet C50.  Second, the court determined that the BANK obtained possession and sold at a foreclosure sale the 1983 Ford F-700, the 1971 Chevrolet C20, and the 1984 Chevrolet C30, that the three trucks had no doors, hoods or engines, and that the $500.00 in proceeds that the BANK received was properly credited to the loan balance.  Third, the court determined that the backhoe and the ARC welder, ordered to be turned over by the DEBTOR in the February 26 order, were not turned over as ordered.  Based upon this failure, the court found the DEBTOR to be in indirect civil contempt of court.

Acknowledging the necessity of including a monetary "purge" provision in its order, the court based the purge amount on the value of the collateral not turned over, as follows:

<u>Collateral</u>                                                           <u>Value</u>

---

[2]Contempt that occurs outside the presence of the trial court is indirect.  Proof of a party's wilful disobedience of a court order is essential to a finding of indirect civil contempt.  Once the petitioner proves noncompliance with a court order, the burden shifts to the alleged contemnor to show that the noncompliance was not wilful or should be excused.  *Cetera v. DiFilippo*, 404 Ill.App.3d 20, 41, 934 N.E.2d 506 (Ill.App. 1 Dist. 2010).

[3]A transcript of that hearing was admitted into evidence.

| | |
|---|---|
| 1976 J.D. Dozer and 2004 Top Hat Trailer | $19,000 |
| 1988 Vermeer backhoe | 7,500 |
| 2005 Lincoln ARC welder and 1968 Chevy C-50 | 5,000 |
| TOTAL | $31,500 |

The court stated that the DEBTOR "can either produce the items or $31,500 in cash to purge." The court ordered the DEBTOR to report to the county jail immediately to begin serving "an indeterminate sentence of incarceration" until "he posts the money or produces the items." An arrest warrant/body attachment was issued which set bond in the amount of "$31,500 cash No 10%" and required the DEBTOR to appear at "8:30 a.m. on the Friday following his being picked up." The warrant was not served; nor did the DEBTOR turn himself in.

**Bankruptcy Proceeding**

The DEBTOR filed a Chapter 7 petition on May 15, 2007. He listed no vehicles, no equipment, and no secured creditors. The BANK was scheduled as an unsecured creditor holding a judgment for $53,000. For reasons not explained at trial, the DEBTOR failed to disclose the pending detinue action on his Statement of Financial Affairs. He also failed to disclose any property that had been repossessed or sold at a foreclosure sale within the year before filing. He also did not schedule any non-ordinary course transfers of property within two years before filing. At the time the petition was filed, the DEBTOR was married and was employed as a truck driver for J&R Schugel Trucking, earning $2,600 per month. The BANK did not attend the first meeting of creditors.

Upon receiving notice of the DEBTOR'S bankruptcy, counsel for the BANK filed a suggestion of bankruptcy in the state court proceedings and caused an order recalling and cancelling the arrest warrant to be entered on May 25, 2007. The BANK filed proofs of

claim for each of its loans.[4]   The total value of the collateral was listed in the claims at

$30,363.41.   The DEBTOR did not reaffirm the debts with the BANK, and he received a

discharge on August 30, 2007.   The DEBTOR took no action to avoid any of the BANK'S

liens on the equipment.   The BANK did not object to the DEBTOR'S discharge or the

dischargeability of its debts.   The case was closed as a no-asset case.

**Post-Discharge Proceedings**

Following the DEBTOR'S discharge, the BANK continued to prosecute the still-

pending detinue action.   On March 3, 2008, the BANK filed a new motion for rule to show

cause, based on the DEBTOR'S continuing failure to comply with the judgment in detinue

entered June 15, 2006, listing the remaining five items of collateral which the DEBTOR had

failed to turn over to the BANK, and asking that the DEBTOR again be held in contempt

of court.   The motion did not mention the alternative money judgment.   An order was

entered requiring the DEBTOR to appear on March 26, 2008.   An order entered on that date

required the DEBTOR to appear on April 28, 2008, but that hearing was rescheduled to

May 8, 2008.   The DEBTOR failed to appear at the hearing on May 8, 2008, and Attorney

Blade's request for a continuance was denied.   The court issued an arrest warrant for the

DEBTOR fixing bond at $31,500 cash and ordering the DEBTOR to appear in court "at 8:30

a.m. on the Friday following his being picked up."   Adding to his troubles, the DEBTOR

---

[4]The BANK filed the following claims:

Claim #1-1 for $19,000 secured; $5,955.08 unsecured; secured by a purchase money security interest in a1976
    John Deere 450 Dozer and a 2004 Top Hat 25' Trailer (loan dated February 1, 2005);
Claim #2-1 for $5,643.28, as unsecured (loan dated May 31, 2005);
Claim #3-1 for $14,751.56, as unsecured (loan dated April 5, 2005) (attached note states purpose of loan is to
    purchase a new bulldozer tractor and states other collateral as 1983 Ford F700, 1988 GMC);
Claim #4-1 for $7,500 as secured by a 1988 Vermeer Backhoe, $1,082.79 as unsecured (loan dated January 28,
    2005); and
Claim #5-1 for $3,863.41 as secured by purchase money security interests in a 1968 Chevy pickup and
    a 2005 Lincoln Electric Arc & MIG welder, $2,300 as unsecured (loan dated March 18, 2005).

and his wife separated on May 21, 2008, and she filed a petition for dissolution days later.

The parties entered into a marital settlement agreement on May 28, 2008, and a judgment

was entered on May 30, 2008, dissolving the DEBTOR'S marriage.  After becoming aware

of the outstanding arrest warrant, the DEBTOR voluntarily turned himself in on Saturday,

May 31, 2008.  Unable to pay the $31,500 bond amount, he remained incarcerated until

Friday, June 6, 2008.

When the DEBTOR was brought before the court and in response to the judge's

inquiry as to his failure to return the equipment, the DEBTOR responded that he "just

need[ed] to get with the bank and go try to pick this stuff up."[5]  Exasperated by the lack of

progress, the court inquired as to the outcome of the DEBTOR'S meeting with the

representatives from the BANK at the DEBTOR'S residence on February 21, 2007.  The

BANK'S representative spoke up and advised the judge that the DEBTOR had stated that

the BANK was not going to get one item because it had been sold.  The DEBTOR, speaking

directly to the judge because his attorney had stepped out of the courtroom, stated that he

had turned over the property that was at his house, but had not gone with the BANK to

attempt to locate and recover the other property.  The state court judge, advised that the

DEBTOR'S attorney intended to return shortly, set the matter aside.  At some point, the

DEBTOR'S attorney returned, and the parties met outside the presence of the court and

reached a settlement, calling for the DEBTOR to make payments to the BANK of $750 per

month and providing for his "conditional" release.  The state court docket reflects that the

DEBTOR was current in payments in December, 2008, but had fallen behind by April, 2009.

---

[5]A transcript of the June 6, 2008, hearing was admitted into evidence.

The total amount paid by the DEBTOR was $4,500.

**The Adversary Proceeding**

On October 8, 2009, the DEBTOR filed a complaint in this Court against the BANK for violation of the discharge injunction, alleging that the BANK'S wrongful conduct resulted in the DEBTOR'S arrest and incarceration and coerced him into making payments on a discharged debt.[6]  The trial was held over two days on October 7, 2010, and October 21, 2010.  The testimony of the primary witnesses is summarized as follows.  The DEBTOR, forty-nine years old at the time of trial, testified that the BANK'S loan officer, Robert Ringsdorf, solicited him to build a pond and a pole building on his property and that, at Ringsdorf's behest and with funds extended by the BANK, he acquired the dozer and the top hat trailer to perform that project.  The DEBTOR barely got started on the project before encountering difficulty with his equipment.  Within two to three weeks of resuming the work, he was fired by Ringsdorf because he was unhappy with the pace of the project.  Ringsdorf paid him $1,500 or $2,000.  At the time Ringsdorf approached him about the pond, his existing loans were in default.

The DEBTOR testified that the BANK advised him that he needed to sell some of his equipment in order to pay down the loans.  After attempts to sell the collateral at prices suggested by the BANK were unsuccessful, the BANK authorized the DEBTOR to sell the equipment at reduced amounts.  The DEBTOR contends that most of the collateral was sold in 2005.  The DEBTOR testified that he sold the dozer to Jim Nowers for $8,000, paying over

---

[6]The original complaint filed by the DEBTOR also included counts for abuse of process, intentional infliction of emotional distress, malicious prosecution, and to recover the funds paid to the BANK.  By agreement, the DEBTOR withdrew the original complaint and filed a motion for contempt, which is essentially identical to the complaint.  The DEBTOR later withdrew Counts 2, 3 and 4 of the original motion and filed an amended motion, alleging a violation of the discharge injunction and seeking a recovery of funds paid to the BANK.

$6,000 to Ringsdorf, in cash, at the BANK.  Ringsdorf did not give him a receipt at the time

of payment, advising that he would bring one out to the job site, but none was received.

The DEBTOR testified that the backhoe and the dump truck were sold to one Milton, an

individual employed by American Steel Carports, in Kewanee, for $3,000.[7]  According to

his testimony, Milton accompanied him to the BANK, handing the cash over to Ringsdorf

and Milton received the title to the dump truck.  Again, no receipt was received.  The top

hat trailer was sold to one Gilbert, at GK Trailer Sales, in Prophetstown, for $4,500, with

$4,000 being turned over to Ringsdorf.  Because the DEBTOR had purchased the trailer

new, the certificate of origin had to first be put in the DEBTOR'S name so that he could

then transfer title to the purchaser.  The DEBTOR sold the Lincoln ARC welder for $800,

keeping the proceeds for himself.  The DEBTOR testified that this information was given

to both Attorney Blade and to the BANK prior to the entry of the order on February 26,

2007.  The remaining collateral, consisting of three trucks, was in the DEBTOR'S barns and

was picked up by the BANK on a straight bed truck.[8]  The DEBTOR did not recall signing

the titles transferring the vehicles to the BANK.

        The DEBTOR testified that he had been aware of the warrant for his arrest but had

missed the hearing dates because he was out on the road.  According to his testimony, the

hearings were set on short notice, and his work required him to work his way back home,

picking up and delivering various loads en route.

        According to the DEBTOR'S version of the hearing that took place on June 6, 2008,

---

[7]Milton later relocated to the Texas office.  The DEBTOR gave a current phone number for him.

[8]While the DEBTOR insisted, both on direct examination and on cross that the BANK picked this equipment up after
he filed bankruptcy, his recollection was mistaken.  He was equally insistent that those items of collateral were the only
remaining items in his possession when the petition was filed.

after his second arrest, he did not have an opportunity to speak directly with the judge. The DEBTOR testified that the BANK'S attorney, Ms. Walsh, had a list of the purchasers of the equipment whom she attempted to telephone from the courtroom.  She reached only one purchaser, Melvin.  After inquiring whether he had purchased equipment from the DEBTOR, she hung up the phone and said "Scratch that one."  The DEBTOR claimed that when he again told the BANK that he did not have the equipment because it was sold and the proceeds turned over to Ringsdorf, the BANK inquired whether he had a relative who could loan him some money to "help get him out of this mess."  According to the DEBTOR, one of the BANK'S representatives cut him off when he began talking about Ringsdorf and told him that Ringsdorf had nothing to do with the matter.  The DEBTOR regarded the BANK'S suggestion that he go along with a deputy to the places where the purchasers lived in order to take back the collateral as useless.  The BANK first suggested that he pay $5,000 and when he told them if he were released and got a job he could make payments, the BANK suggested he make payments of $1,000 per month.  In response to his statement that the amount was too high, the BANK stated that it would not agree to payments of less than $750 per month, or the DEBTOR could just remain in custody.  The DEBTOR agreed because he believed that was the only way he could get out of jail.  The DEBTOR stated that he had not contacted his bankruptcy attorney because he was under the assumption, because the BANK continued to pursue him, that he was obligated to pay.

The DEBTOR testified that at the time of his second arrest, he was working as a trucker earning $1,000 to $2,500 per week.  He was fired as a result of the arrest, and was out of work for two or three additional weeks.  He testified that upon his release,  his wife

packed up his belongings and told him not to come home.  At the time of trial, he was

working as a trucker earning approximately $1,000 a week.  The DEBTOR admitted that

he had a criminal record, having been arrested for theft in connection with tools which

were subject to a lease/purchase agreement.  He served approximately two and one-half

years in prison.  The DEBTOR also admitted that he had also been in jail for three or four

days for writing a bad check.  At the time of trial, he was on probation in connection with

the felony theft and bail jumping charges.

The DEBTOR'S sister testified on his behalf.  Her testimony disclosed that she

believed the BANK'S officer had, on occasion, accepted cash payments from the DEBTOR

without crediting his account.  Specifically, she testified that when she and her husband

decided to sell a pickup truck which they had purchased from the DEBTOR with financing

through the BANK, the title to the vehicle had remained in the DEBTOR'S name, and they

were required to have it transferred to their names prior to signing it over to the purchaser.

 She insinuated that the BANK officer pocketed the cash.

Mr. Blade, an experienced attorney who had represented the DEBTOR on various

occasions over a period of several years, testified that he had not practiced bankruptcy law

for twenty years.  He testified that the BANK had been advised "since the beginning" that

the DEBTOR did not have all of the items of collateral.  He stated that the DEBTOR had

advised the BANK on several occasions that items had been sold and that he did not know

their current location.  Attorney Blade clarified that he believed, at the time of the hearings

in late February and March, 2007, prior to the filing of the bankruptcy, that the DEBTOR

had "access" to the property, meaning that  items of equipment were located on property

belonging to others, who were holding it "for him or against him." He testified that when the parties met outside the presence of the state court judge on June 6, 2008, after the DEBTOR'S second arrest, he believed that the DEBTOR had control over only one or two items. Blade acknowledged that he drafted the settlement order which reflected the DEBTOR'S agreement with the BANK. His understanding of the provision of the order requiring monthly payments be made "until debt paid" referred to the balance of the original notes owed to the BANK. He stated that the DEBTOR agreed to make payments to the BANK because he no longer had most of the collateral and it was the only way he could get out of jail. Noting that he had not represented debtors in bankruptcy for a period of twenty years, Attorney Blade, while admitting he had not actually checked the bankruptcy schedules to determine if the BANK had been listed, stated that he thought that if the BANK had not been listed in the bankruptcy schedules, the debt might not have been discharged. Concerned that the BANK'S actions may have run afoul of the Bankruptcy Code, he recommended to the DEBTOR that he should contact a bankruptcy lawyer.

Robert Ringsdorf, the representative of the BANK who made the loans to the DEBTOR, admitted that he hired the DEBTOR to build a pond on his property, but denied that a loan was made to the DEBTOR for the purchase of equipment specifically for that purpose. Ringsdorf denied that he ever accepted cash payments directly from the DEBTOR. He testified that if the DEBTOR had tendered cash, he would have escorted the DEBTOR to a teller at the BANK who would have processed the payment and issued a receipt. Ringsdorf clarified that if he was advised by a customer that a vehicle was being sold, the loan file containing the title would be retrieved from the BANK records and kept

in the loan officer's office; that the titles to the vehicles were customarily kept in the customer's file; and that upon default, the loan file would have been transferred to a collections officer.

The President and Chief Executive Officer of the BANK testified that Ringsdorf left the BANK in 2007, following his brother who had left the BANK a short time before. He denied that Ringsdorf was ever suspected or accused of misappropriating any assets of the BANK or any customer payments. Nothing in the BANK'S files evidences any of the alleged cash payments.

Allison E. (Bartsh) Walsh, the attorney for the BANK throughout the relevant time period, testified that when the turnover order was entered on February 26, 2007, she believed that the DEBTOR had possession or control over the property. Ms. Walsh was advised by the BANK that just days prior to the entry of that order, when the representatives of the BANK met with the DEBTOR at his residence as ordered by the court, the DEBTOR turned over a few items of collateral, but would not let the BANK'S representatives into his barns, nor did he take them to any other location. The DEBTOR'S actions caused her to believe that he still had possession or control over the collateral and that he was continuing to hide it from the BANK.

Ms. Walsh testified that the BANK received notice of the filing of the bankruptcy, but elected not to pursue a motion for relief from the stay or any other relief, due to the attorney fees and costs that would be incurred. She stated that if she had believed that the DEBTOR had wrongfully disposed of the collateral, she would have filed a nondischarge-ability action. She testified that she typically reviews certain of the schedules filed by a

debtor, but is not troubled when a debtor mischaracterizes a secured claim as unsecured.

After the discharge was issued, she understood that the BANK was limited to recovering

the collateral.

Ms. Walsh, certain that the DEBTOR had notice of the state court hearings occurring

after his bankruptcy, testified that in response to Judge O'Connor's inquiry as to why the

DEBTOR'S bond had previously been set so high, she explained that Judge VandeWiele

had based the bond on the value of the collateral.  Judge O'Connor decided to follow suit

and she drafted the arrest warrant with the same bond amount set by the court.

She testified that  on June 6, 2008, in the courtroom,  the DEBTOR again advised the

BANK that if he were released from jail he could get the collateral.  In response to her

inquiry as to its location, the DEBTOR gave her the name of an individual who had one

piece of the equipment.  From the courtroom, she placed a call to an individual named

Milton, to confirm whether he had possession of a piece of equipment from the DEBTOR.

Milton advised her that the DEBTOR had given it to him in satisfaction of a preexisting

obligation, but that he had later given it to a neighbor.  She did not recall that he gave her

any other information and she did not make any other calls.

Ms. Walsh testified that it was the state court judge who directed the parties to

confer and try to work the matter out and that it was the DEBTOR who first offered to

make payments to the BANK.   According to her testimony, the DEBTOR had previously

offered a payment plan to BANK on April 7, 2008, but the BANK rejected the offer, having

little faith in the DEBTOR'S promise to pay.  It was her intention that the "debt" referred

to in the agreed order was not the full amount of the BANK'S indebtedness but was limited

to $31,500, the value of the collateral as previously determined by the court. She stated that

the DEBTOR never advised her that he did not have the collateral or that that was why he

would have to make payments.  Because the DEBTOR had previously refused to allow

BANK employees into his barns, she still believed on June 6, 2008, that he was hiding the

collateral. She denied that the payments the DEBTOR proposed to make were involuntary,

asserting that the DEBTOR had other options in that he could have elected to either testify

in court or surrender the collateral.   In her view, the BANK'S acceptance of the payments

proffered by the DEBTOR effectuated the "purge" provision of the contempt order.

## ANALYSIS

**A. General Principles**.

The permanent injunction of section 524(a)(2), along with the automatic stay of

section 362(a), are the cornerstones of bankruptcy law.  *In re Mooney,* 340 B.R. 351

(Bankr.E.D.Tex. 2006); *In re Curtis*, 322 B.R. 470 (Bankr.D.Mass. 2005).  Section 524(a)(2) of

the Bankruptcy Code, which governs the effect of the discharge, provides, in relevant part:

> (a) A discharge in a case under this title –

>> (1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727....

>> (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor....

11 U.S.C. § 524(a).  The protections afforded by the discharge injunction are very broad,

effectuating a financial fresh start for the debtor and insuring that the debtor will not be

16

pressured in any way to repay debts which have been discharged. *In re Nassoko*, 405 B.R. 515 (Bankr.S.D.N.Y. 2009). Because of its fundamental importance, the discharge injunction requires a combination of respect and deference by the debtor's prepetition creditors.

The effect of the discharge is not to extinguish the debt, but rather to release the debtor from personal liability. *Hall v. National Gypsum Co.*, 105 F.3d 225 (5th Cir. 1997). Thus the discharge voids the *in personam* liability of the debtor, but it does not affect the creditor's *in rem* rights with respect to property. *Matter of Paeplow*, 972 F.2d 730 (7th Cir. 1992); *Matter of Hunter*, 970 F.2d 299 (7th Cir. 1992). It has long been a fundamental principle that unavoided liens pass through bankruptcy unaffected by the debtor's discharge.[9] *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). Thus, a bankruptcy discharge does not affect a security interest that a creditor may have in the debtor's property. Important here, the creditor's lien "sticks" with the asset notwithstanding transfer of the asset by the debtor. *Matter of CMC Heartland Partners*, 966 F.2d 1143, 1147 (7th Cir. 1992).

The line between actions that violate the discharge injunction and those that are permissible following a bankruptcy discharge is not always easy to delineate. *In re Lumb*, 401 B.R. 1 (1st Cir.BAP 2009); *In re Burkepile*, 2010 WL 3501814 (Bankr.N.D.Ohio 2010). A creditor's exercise of legitimate state court rights, pursued in a harassing and coercive manner, resulting in repayment of a discharged debt, may violate the discharge injunction. *In re Paul*, 534 F.3d 1303 (10th Cir. 2008); *In re Pratt*, 462 F.3d 14 (1st Cir. 2006). Although

---

[9]As the Seventh Circuit noted in *Matter of Penrod*, 50 F.3d 459, 463 (7th Cir. 1995), the rule is subject to qualification where the liens are "brought into the bankruptcy proceeding and dealt with there." But the DEBTOR did not challenge the BANK'S liens and the BANK, in choosing to ignore the bankruptcy proceeding, did not imperil its liens.

noting its application should be rare, the Seventh Circuit has recognized the "coercive

effects" test. *In re Kuehn*, 563 F.3d 289 (7th Cir. 2009). The pursuit of *in rem* rights, only as

a subterfuge to collect a discharged debt from the debtor personally, violates the discharge

injunction. *See In re Evans*, 289 B.R. 813 (Bankr. E.D.Va. 2002). Each case must be decided

on its particular facts. *Pratt*, 462 F.3d at 19.

Notwithstanding that the creditor is enjoined from acting to collect a discharged

debt, the Bankruptcy Code expressly permits a debtor to voluntarily repay a discharged

debt, even without a reaffirmation agreement. 11 U.S.C. § 524(f). Determining whether a

debtor's post-discharge payments are truly "voluntary" can be difficult. For a payment to

be voluntary, it must be free from creditor influence or inducement; voluntariness is

destroyed where payment is the result of pressure brought to bear by the creditor. *DuBois*

*v. Ford Motor Credit Co.*, 276 F.3d 1019, 1022-23 (8th Cir. 2002).

The issue of voluntariness is further complicated in the context of an unavoided

security interest in property. Not infrequently, a debtor will continue to pay a secured

creditor in order to retain the possession and use of the creditor's collateral. While a desire

to retain property provides a motive for making voluntary payments, it does not foreclose

inquiry into whether such payments are truly voluntary or whether the creditor is actually

using a threat of repossession in an impermissibly coercive manner. It is clear, however,

that a creditor's mere acceptance of voluntary payments does not violate the discharge

injunction. *Cox v. Zale Delaware, Inc.*, 239 F.3d 910, 915-16 (7th Cir. 2001). Absent a valid

reaffirmation, however, voluntary payments may be stopped at any time without personal

liability of the debtor. *In re Francis,* 426 B.R. 398 (Bankr.S.D.Fla. 2010); *In re Grabinski,* 150

B.R. 427 (Bankr.N.D.Ill. 1993). The creditor's sole remedy is repossession of its collateral.

Creditors are cautioned not to overstep the bounds of section 524 by creating the

appearance of a binding promise to pay, unenforceable absent a filed reaffirmation

agreement. *Cox,* 239 F.3d at 915.

Unlike section 362(k) of the Bankruptcy Code, which provides a right to recover

damages for an individual injured by a wilful violation of the automatic stay, section 524

does not expressly provide a right of action or remedies for a violation of the discharge

injunction. In the Seventh Circuit, civil contempt is the proper remedy for a creditor's

violation of the discharge injunction. *Id.* at 917; *In re Williams,* 368 B.R. 744 (Bankr.N.D.Ind.

2007); *In re Torres,* 117 B.R. 379 (Bankr.N.D.Ill. 1990). A contempt request is properly

initiated by motion. Fed.R.Bank.Pro. 9020.

A creditor may be found in contempt if it (a) knew of the discharge and (b) intended

the actions that violated the discharge. *In re Hardy,* 97 F.3d 1384, 1390 (11th Cir. 1996); *In

re Pincombe,* 256 B.R. 774, 783 (Bankr.N.D.Ill. 2000). A creditor's deliberate intent to violate

the injunction is not necessary. *In re Manzanares,* 345 B.R. 773, 790-91 (Bankr.S.D.Fla. 2006).

If a creditor's conduct violates the injunction, good faith is no defense. *In re Elias,* 98 B.R.

332, 337 (N.D.Ill. 1989); *In re Cherry,* 247 B.R. 176, 187 (Bankr.E.D.Va. 2000). This principle

is consistent with civil contempt proceedings outside of bankruptcy. *See McComb v.

Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949) (since purpose of

civil contempt is remedial, it matters not with what intent the defendant did the prohibited

act; an act does not cease to be a violation merely because it may have been done

innocently); *Matter of Establishment Inspection of Microcosm,* 951 F.2d 121, 125 (7th Cir. 1991) (sincere but mistaken belief of compliance with court order does not relieve contempt). It is also consistent with the standards applied to wilful stay violations. *In re Redcliffe,* 563 F.3d 627, 631 (7th Cir. 2009) (wilful violation does not require specific intent to violate the stay).

In a civil contempt proceeding for a discharge injunction violation, a debtor may recover post-discharge payments he made to the creditor, but only to the extent they were not voluntary. *Cox,* at 916. The debtor may also recover a reasonable attorney's fee. *Id.* He may not, however, recover punitive damages in a civil contempt proceeding. *Id.* at 916-17; *In re Andrus,* 184 B.R. 311, 315 (Bankr.N.D.Ill. 1995), *aff'd,* 189 B.R. 413 (N.D.Ill. 1995).

A federal trial court may not enter an order of civil contempt unless it finds a violation by clear and convincing evidence. *In re Resource Technology Corp.,* 624 F.3d 376, 387 (7th Cir. 2010). Since discharge injunction violations are remedied as civil contempt proceedings, courts have applied the heightened standard of clear and convincing evidence. *Kimco Leasing, Inc. v. Knee,* 144 B.R. 1001, 1009 (N.D.Ind. 1992); *In re Weinhold,* 393 B.R. 623, 628 (Bankr.E.D.Wis. 2008); *Pincombe,* 256 B.R. at 782; *Andrus,* 184 B.R. at 315; *In re Ryan,* 100 B.R. 411, 417 (Bankr.N.D.Ill. 1989).

The DEBTOR argues for a preponderance of the evidence standard, noting that a few courts have questioned whether the lesser standard should apply after the Supreme Court's decision in *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). *See Pratt,* 462 F.3d at 21; *In re Jones,* 389 B.R. 146, 160 n.15 (Bankr.D.Mont. 2008). It is difficult to see how *Grogan,* holding that the standard of proof in nondischargeability actions under section 523 is preponderance of the evidence, has any application to actions for civil

contempt under section 524. Regardless, the decision announced and all factual determinations made in this Opinion would be the same under either standard.

**B. Wrongful Intent Not Necessary**.

It is not disputed that the BANK had notice of the DEBTOR'S discharge. Regarding the BANK'S intent, the DEBTOR, relying on *In re Paul*, 534 F.3d 1303 (10th Cir. 2008), contends that the BANK'S hidden agenda in continuing the detinue suit post-discharge was not to recover its collateral, but to harass the DEBTOR and coerce him into paying his discharged obligation to the BANK. If so, then all of the BANK'S post-discharge actions would have been wrongful. In *Paul*, the court noted that a debtor may prove a violation of the discharge injunction by establishing that a creditor's action, though not expressly prohibited by the discharge injunction, was not what it appeared to be, but was one intended to collect a discharged debt *in personam*. The court reviewed two cases with opposite results. In the first, *In re Pratt*, the holder of a worthless lien on the debtors' vehicle refused to accept surrender of the car and refused to release the lien, which precluded the debtors from junking it. While neither refusal by itself violated the discharge injunction, the court in *Pratt* concluded that the debtors would be coerced into reaffirming the debt in order to obtain a release of the lien and to avoid future costs in connection with retaining the car. Given the creditor's position that it would not repossess the vehicle because it was not worth the trouble, the court determined that its refusal to release its lien unless the debtors paid the full amount of the debt, was tantamount to a demand for a reaffirmation and, being coercive in its effect, constituted a wilful violation of the discharge injunction.

21

The court in *Paul* contrasted *Pratt* with *In re Schlichtmann*, 375 B.R. 41 (Bankr.D.Mass. 2007), a case also involving a creditor's pursuit of *in rem* rights following discharge. Describing the different outcome, the court stated:

> Unlike the car in *Pratt*, the escrow fund had a substantial value and thus the creditor's facially permissible actions with respect to the collateral were not undercut by the evident lack of any legitimate economic purpose - the creditor's "desire to enforce its rights in the collateral suffice[d] to explain [its] actions." *In re Schlichtmann*, 375 B.R. at 98.  Under these circumstances, "one would need very damning evidence indeed to justify a finding ... that [the creditor] was attempting not merely to enforce its *in rem* rights but also, or instead, to obtain payment from [the debtor] *in personam* on the prepetition debt." *Id.*  Such evidence was lacking, and the debtor's claim for § 524 sanctions was denied.

534 F.3d at 1309.

*Pratt* stands for the proposition that even if a creditor is not acting purposefully and directly to obtain payments on a discharged debt, there may still be a violation if the effect of the creditor's actions was to coerce the debtor to pay.  This Court agrees with that reasoning.  So even if the BANK was acting in good faith only to enforce its lien rights, its actions must be examined to determine whether they had the effect on the DEBTOR of coercing payment.

## C.  Effect of Bankruptcy Discharge.

The effect of the discharge on the detinue judgment is clear.  The judgment in detinue ordered the DEBTOR to return the collateral, failing which the BANK was awarded a money judgment for the value of the collateral plus detention damages, in an amount totaling $52,172.95.  So the single judgment awarded *in rem* relief and *in personam* relief. After the DEBTOR'S discharge, the money judgment portion was void but the *in rem*

22

portion remained enforceable, since judgments are voided only "to the extent" of personal

liability.  11 U.S.C. § 524(a)(1).

But the discharge had effects beyond voiding the *in personam* portion of the detinue

judgment, and it is important to recognize the full extent of the discharge.  A Chapter 7

discharge "discharges the debtor from all debts that arose before the date of the order for

relief."  11 U.S.C. § 727(b).  A debt arises on the date that the conduct (or misconduct)

giving rise to the claim occurs.  *In re Papi,* 427 B.R. 457, 465-66 (Bankr.N.D.Ill. 2010).  So

debts not reduced to judgment, not sued upon, and even those where the creditor is

completely unaware that wrongful conduct has occurred, are subject to discharge if the

conduct occurred before entry of the order for relief and the creditor is properly scheduled

or otherwise has actual notice of the filing in time to file a nondischargeability complaint.

*See* 11 U.S.C. § 523(a)(3).  The discharge operates as a permanent injunction against any

attempt to collect all prepetition, *in personam* debts, including debts for intentional torts if

the creditor fails to file a timely complaint.  *In re McGhan,* 288 F.3d 1172, 1176 (9th Cir.

2002).  The burden is on the creditors to diligently investigate any suspicious conduct

before discharge.  *Zedan v. Habash,* 529 F.3d 398, 406 (7th Cir. 2008).

What of the BANK'S failure to take action in the bankruptcy case?  That decision,

while permissible, had serious consequences.  The BANK was ostensibly faced with a

resistant customer refusing to comply with a turnover judgment who appeared to be

hiding the collateral.  The BANK had every reason to be suspicious.  The meeting of

creditors, at which the DEBTOR'S attendance was mandatory, was an easy and inexpensive

chance to question the DEBTOR under oath about the collateral – but the BANK passed on

it.  The bankruptcy case was also the BANK'S one opportunity to determine whether the

DEBTOR had wrongfully disposed of its collateral giving rise to a nondischargeability

claim under section 523(a)(6) – once again the BANK passed.  As a result, the BANK

forever lost the opportunity to receive monetary compensation for any prepetition contract

breach or tort committed by the DEBTOR.  The BANK could have also attempted to

negotiate a reaffirmation agreement as a lawful way to accept payments in lieu of return

of the collateral but it did not do so.

The BANK'S decision to forego the exercise of, and thus forfeit, certain rights that

could have been asserted in the bankruptcy case, but not thereafter, limits the remedies

available post-discharge.  For example, if the DEBTOR wrongfully converted the collateral

prepetition, by selling it and failing to remit the proceeds to the BANK, the BANK no

longer has a remedy available to redress that wrong.  Though a creditor who suspects a

debtor of misconduct that would give rise to nondischargeability under section 523(a)(2),

(4) or (6) is not obligated to file an adversary complaint, not doing so results in loss of the

right to a monetary remedy for misconduct covered by those provisions under section

523(c).  *Matter of Towers,* 162 F.3d 952, 956 (7th Cir. 1998).

In addition to the money judgment for $52,172.95, a related, but separate, payment

obligation was imposed prepetition on April 16, 2007, when the state court ordered the

DEBTOR to return the five remaining items of collateral or pay the sum of $31,500.  The

payment obligation constituted a debt that arose before the order for relief that, as such,

was subsequently discharged. 11 U.S.C. § 727(b).  The order to pay $31,500 was "a personal

liability of the debtor," notwithstanding that it was conditioned on a failure to return the

collateral and that it represented the judicially determined value of that collateral. By operation of section 524(a)(2), the BANK was enjoined from continuing to attempt to collect that debt as a personal liability of the debtor.

So where did that leave the BANK? The portion of the detinue judgment for the payment of $52,172.95 was void and unenforceable. The April 16, 2007, order to pay $31,500 was unenforceable. Any potential claim of nondischargeability, based on a wrongful conversion of collateral or otherwise, to the extent that such conversion occurred prepetition, was time barred. All that was left was the BANK'S right to enforce its security interests through possession and foreclosure sale without deficiency. Use of post-judgment remedies in the pending detinue action was permissible only to the extent those remedies were limited in focus to recovery of the missing collateral.

## D. BANK'S Post-Discharge Actions.

After discharge, the BANK continued to seek enforcement of the judgment in detinue even though the judgment contained an *in personam* element. In the exercise of caution, the BANK could have started anew by filing a replevin complaint that pleaded the prior discharge, or it could have moved to vacate the *in personam* portion of the detinue judgment and the April 16, 2007, order - it didn't. So its actions in seeking to enforce the judgment and the order with the money awards intact left its motives open to interpretation, and left it exposed to the coercive effects problem.[10]

The Court credits the testimony of Ms. Walsh, an experienced bankruptcy attorney,

---

[10]It is far from clear whether the state judges who held hearings in the detinue case post-discharge were cognizant of the discharge when they held the hearings and crafted their orders. While the BANK generally cannot be held responsible for the actions of the judges, the BANK could have done a better job of reminding the judges, at each hearing, that the DEBTOR'S personal liability had been discharged.

as to her state of mind, that her post-discharge actions were intended only to enforce the

BANK'S security interests.   All of the actions that she took up until June 6, 2008, are

consistent with her stated intent.   None of those actions can only be explained as an effort

to enforce the personal liability of the DEBTOR for the payment of money.  Specifically, the

BANK filed a motion for rule to show cause on March 3, 2008, asking the state court to hold

the DEBTOR in contempt for failing to turn over the five items of collateral as ordered in

the June 15, 2006, judgment.  Making no mention of the discharged money judgment, the

motion, on its face, does not run afoul of the discharge injunction.  The DEBTOR was

ordered to appear on March 26, 2008.  For reasons not explained, his appearance date was

set over to April 28, 2008, by order of the court, and then again to May 8, 2008.

When the DEBTOR failed to appear on May 8, 2008, the court issued an arrest

warrant setting bond at $31,500 cash.   In the exercise of its discretion, the state court

determined that the DEBTOR could purge the contempt finding by paying a cash amount

of $31,500 and that the same full amount should be used to set the bond on the arrest

warrant.  By setting the bond so high, the court effectively precluded the DEBTOR from

getting out of jail by posting bond.   There is no evidence, however, that the BANK

requested that bond be set so high.

It must also be noted that the state court, in addition to setting the bond at $31,500

cash, set the appearance hearing on the Friday following the arrest.  When the DEBTOR

reported to jail on a Saturday, unable to come up with $31,500 in cash, he spent six days in

jail waiting for his hearing.  This was the unfortunate result of the high bond amount and

setting the hearing on the Friday following the arrest.  But, the BANK cannot be blamed

for the six-day jail stay.[11]

At trial, the DEBTOR contended that he told his attorney and BANK representatives on several occasions that he had transferred and no longer had the collateral.  He also claimed to have tried to tell several state court judges the same thing, but that "no one would listen."  If the DEBTOR did, in fact, convey that information to his attorney, it was never brought to the attention of the state court.  No motion was ever filed to vacate, modify or reconsider the detinue judgment, the subsequent turnover order of February 26, 2007, or the subsequent contempt orders.

The evidence is persuasive that the BANK'S attorney, and the state court, were operating under the presumption that the DEBTOR still had possession of or knew where the collateral was located.  The DEBTOR himself contributed to this belief.  Even as late as the hearing on June 6, 2008, when asked for an explanation by the court, the DEBTOR stated "we just need – I just need to get with the bank and go try to pick this stuff up."

The evidence supports the conclusion that the BANK believed, honestly and in good faith, that the DEBTOR had possession or knew where the collateral was located.  The Court finds and determines that, up to the June 6, 2008, hearing, the BANK was trying to obtain possession of its collateral and was not attempting to collect or coerce the DEBTOR into paying a discharged debt.  So the BANK'S actions up to June 6, 2008, were permissible.

**E.  Prepetition Transfer of Collateral.**

The DEBTOR now claims that he long ago disposed of the collateral.  He argues that

---

[11]No evidence about the state court's scheduling decision was presented.  One can only wonder why the court did not set the appearance date for the next court day after his arrest, rather than the Friday following the arrest.

the BANK'S recovery efforts are violative because he no longer has the property and, therefore, any remedy imposed against him could only have been an *in personam* one. The BANK retorts that the DEBTOR has never presented evidence that he no longer has the collateral, if he did sell or transfer it the sale or transfer was wrongful, and the BANK is nonetheless entitled to obtain information from the DEBTOR about the identity of the transferees.

The Court finds as a matter of fact that the DEBTOR never presented testimony or other evidence to the state court of his alleged transfers of the BANK'S collateral. The civil contempt proceedings were premised on the state court's belief that the DEBTOR was wilfully refusing to turn over the collateral or disclose its location. In a civil contempt proceeding, a contemnor may avoid contempt by establishing a present inability to comply with the order in question. *U.S. v. Rylander,* 460 U.S. 752, 757, 103 S.Ct. 1548 (1983). The DEBTOR failed to prove or request an opportunity to prove a present inability to comply with the turnover order, and repeatedly made statements indicating an ability and desire to comply. So it is difficult to fault the BANK or the state court for continuing to prosecute the civil contempt proceeding in light of the DEBTOR'S own statements, acts and omissions.

The Court rejects the DEBTOR'S testimony that he sold collateral prebankruptcy and turned over at least some of the proceeds to the loan officer, who kept the cash and failed to credit the payments to the loan accounts. The DEBTOR accuses the BANK of sanitizing its files. The allegation was not proved, and was adequately refuted by the testimony of

the loan officer and the BANK'S president.  To the extent the DEBTOR did transfer collateral in violation of the BANK'S rights, and it now appears that he did, the BANK slept on its right to pursue a nondischargeability action in the bankruptcy case and is now barred from seeking redress for that wrong.  However, because liens follow the property despite transfer, the BANK may continue to seek information from the DEBTOR about the transfers and the transferees in furtherance of a good faith intent and effort to locate and obtain possession of its collateral.

## F.  June 6, 2008.

Prefacing an analysis of the critical events of June 6, 2008, it should be recognized that while unavoided liens remain valid after discharge, creditors seeking to enforce such liens are well advised to give the discharge injunction a wide berth.  It is clear that a secured creditor is permitted to use the authority and process of the state court to obtain an order for turnover of collateral, and to enforce the order by actually securing possession of the collateral.  Where the debtor is uncooperative, it is permissible for the creditor to invoke even the ultimate power of the state court to incarcerate the debtor as a means of compelling his cooperation, so long as the purpose is to obtain possession of withheld collateral.  The clarity of permissibility remains intact if possession is obtained.  If possession is not obtained and instead money is paid or agreed to be paid, that clarity is lost and the door to trouble is opened.

The BANK agreed to the June 6, 2008, settlement under which the DEBTOR was to pay $750 per month for an indeterminate period on an unspecified debt.  The DEBTOR and his attorney, Mr. Blade, negotiated and agreed to the settlement.  Neither one testified that

the BANK'S employees or attorney expressed an intent that the payments were in collection of the discharged money judgment. To the contrary, Mr. Blade admitted that the BANK was demanding return of the equipment, not the payment of money. Blade could not recall whether the BANK or the DEBTOR brought up the proposal for payments as an alternative to turnover. Ms. Walsh testified that it was the DEBTOR who first offered to make payments, but that the BANK'S employees were reluctant to agree to accept payments, having had their fill of broken promises by the DEBTOR and expressing concern about the DEBTOR'S ability to make payments. She testified that the DEBTOR persuaded the BANK that he could make monthly payments of $750.

Attorney Blade hand-wrote the order summarizing the "settlement" including the condition that the payments would continue "until debt paid." When questioned at trial about what he meant, he stated that he could not recall if he used "debt" to refer to the note balance or the bond amount contained in the writ of body attachment, which was determined based upon the value of the unrecovered collateral. Blade testified that he believed, on June 6, 2008, that the DEBTOR may still have had control over "some" of the unrecovered collateral.

Ms. Walsh, who signed the June 6 order to approve its form, testified that it was her understanding and intent that the monthly payments were offered by the DEBTOR to permit him to keep the collateral and that Blade used the word "debt" to refer to the bond amount of $31,500. According to the DEBTOR'S testimony about the June 6 negotiation, he agreed to make payments because he viewed it as the only way he was going to be released from jail. He gave no testimony about Blade's use of the word "debt" or the

30

obligation to which the monthly payments were to be credited.

Based upon all the evidence, the Court determines that the BANK went into the June 6, 2008, hearing with the intent to force the DEBTOR to surrender possession of or disclose the location of the collateral, a seemingly straight-forward remedy that the DEBTOR had avoided since the judgment in detinue was entered two years earlier. What the BANK came out of the hearing with, however, was the DEBTOR'S agreement to pay money on a pre-bankruptcy debt. Therein lies the violation.

## G. Payments not Voluntary.

What to make of the DEBTOR'S willing participation in the settlement on June 6, 2008? Because the agreement was based, at least in part, on a dischargeable debt, and was not part of a valid reaffirmation agreement, the DEBTOR'S promise to pay $750 per month is unenforceable against him under section 524(c). But voluntary repayment of a discharged debt is permissible. The problem for the BANK is that the DEBTOR was under duress on June 6, 2008.

Having spent the six previous days and nights in jail, the DEBTOR appeared in court in a county-issued jumpsuit accompanied by a sheriff's deputy. Knowing he could not pay $31,500 in cash, he feared that he would not be released. Knowing he did not have possession of the BANK'S collateral, the DEBTOR believed the only way out was to persuade the BANK to accept a payment proposal. Although represented by counsel, his attorney apparently did not appreciate the opportunity to present evidence of the DEBTOR'S inability to comply with the turnover order.

The Court determines that under these circumstances, the payment agreement was not voluntary and the subsequent payments were not voluntary for purposes of section 524(f). Instead, the continued prosecution of the contempt proceeding coerced the DEBTOR into agreeing to pay. Faced with the DEBTOR'S assertions on June 6, 2008, that he no longer had possession of the collateral, corroborated by a phone call to one transferee, the BANK'S options were limited. It was no longer acceptable for the BANK to continue to enforce the obligation to pay the value of the property not returned by the DEBTOR, as if he was paying for the benefit of keeping the collateral. Neither was it permissible for the BANK to accept a settlement "agreement" entered as a court order under threat of incarceration that had every appearance of imposing mandatory, not optional, payments. *See DuBois,* 276 F.3d at 1022-23.

Does the fact that the payment agreement was accepted and ordered by the state court as a purge of a prior contempt finding help the BANK? In this Court's view, under the circumstances of this case, it does not. Civil contempt is an ambiguous remedy that defies pigeonholing. Sometimes it is used as a mechanism to uphold the authority and dignity of the court. Other times it serves as an additional collection tool in a judgment creditor's toolbox, an alternative "supplementary proceeding." *See* 735 ILCS 5/2-1402; *Guariglia v. Community Nat. Bank & Trust Co.,* 382 F.Supp. 758, 761 (E.D.N.Y. 1974). A monetary award entered as a sanction for contempt is not nondischargeable under section 523(a)(7) where its purpose is to compensate an injured party for damages. *Hughes v. Sanders,* 469 F.3d 475 (6th Cir. 2006).

The state court did not initiate the contempt proceeding *sua sponte.* The BANK filed

a motion asking the court to hold the DEBTOR in contempt for noncompliance with the turnover obligation ordered for the BANK'S benefit and arising out of the detinue judgment. The $31,500 purge amount was payable not to the circuit clerk but to the BANK as an alternative satisfaction of the detinue judgment. The $750 monthly payments were payable to the BANK to be credited against the DEBTOR'S judgment liability (whether the liability was the original money judgment amount or the lesser collateral value amount matters not).

The BANK was using contempt as a method to enforce its judgment. That the state court ordered the remedy does not cleanse it of its coercive effect. In fact, it was the coercive power of the state court that the BANK was using as leverage against the DEBTOR. Creditors may not hide behind the robes of the state court judiciary. Creditors have an affirmative responsibility to evaluate whether the continued prosecution, in whatever procedural guise, of a prepetition lawsuit against a discharged debtor complies with or violates the discharge injunction. It was permissible for the BANK to use the state court's coercive power to force the DEBTOR to return the collateral. It was not permissible to use it to obtain payments.

## H. The BANK'S Alternatives.

The BANK should have seized the opportunity on June 6, 2008, to obtain something it should have obtained during the bankruptcy case and perhaps even earlier: the DEBTOR'S testimony under oath about what he did with the BANK'S collateral. When confronted by the contradiction between the DEBTOR'S statements on the one hand that he no longer had or knew the whereabouts of the collateral, and his offer to make monthly payments on the other hand, perhaps the BANK'S attorney should have gone back into the

33

courtroom and said something along the lines of the following to Judge O'Connor:

"Your Honor, first of all, I'd like to remind the court that Mr. Butler previously went through Chapter 7 bankruptcy and discharged his personal liability for all of his debts to The National Bank. Since then, we have been attempting only to enforce unavoided liens on certain commercial vehicles and equipment that have not been returned by Mr. Butler. Up until now, it has been our belief that Mr. Butler either still had possession of the collateral or knew where it was, but was refusing to turn it over or disclose its location. This belief was the basis for the turnover order, the noncompliance with which has led to contempt proceedings and Mr. Butler's incarceration. That same noncompliance caused the court to set a very high cash bond amount of $31,500, which is the previously determined value of the unreturned collateral. Mr. Butler was ordered to either return the collateral or pay the full amount of its value.

It now appears that circumstances have changed. Mr. Butler now claims that all of the collateral was previously disposed of and that he no longer has possession or knowledge of the location of any of it. If these claims are true, then compliance with the court's turnover orders is impossible. Mr. Butler is offering to agree to make monthly payments to the Bank so that he may be released from custody today, but if he no longer has the property, the Bank cannot accept his agreement to make payments given the discharge of his personal liability.

As an alternative, since Mr. Butler and his attorney are here, and the Bank is still entitled to obtain information from Mr. Butler as to the transfers, I would request that the court permit us to question him, under oath, about the details of the transfers. Then, if the court is satisfied that he no longer has possession or control of any of the collateral, the contempt order may be vacated, and he may be released without further condition."

To clarify, the Court is not saying that a post-discharge secured creditor may never accept a debtor's voluntary offer to pay money as a substitute for return of collateral. A post-discharge payment agreement arising out of an unreaffirmed discharged debt may be valid and enforceable but only if supported entirely by new consideration. *In re Odling,* 2001 WL 1155154 (N.D.Ill. 2001); *In re Weeks,* 400 B.R. 117 (Bankr.W.D.Mich. 2009); *In re Smith,* 224 B.R. 388 (Bankr.N.D.Ill. 1998); *In re Stevens,* 217 B.R. 757 (Bankr.D.Md. 1998). So a secured creditor may obtain a valid post-discharge agreement if the debtor is actually retaining the use and benefit of collateral and is agreeing to pay only its current fair market

34

value, so that no portion of the payments are in consideration of the discharged debt.

The June 6, 2008, settlement agreement was outside the narrow scope of the exception to the reaffirmation rule for agreements based entirely on new consideration. As such, the agreement was invalid and unenforceable, notwithstanding that it was incorporated into a state court order. The BANK violated the discharge injunction by accepting payments under the invalid settlement agreement embodied in the June 6, 2008, order.

## I. Damages.

The DEBTOR seeks compensation for a laundry list of harms, including reimbursement of the $4,500 paid to the BANK after the June 6, 2008, settlement plus prejudgment interests; damages for emotional distress caused by the failure of his marriage and the loss of his job; lost wages while he was in jail and out of work; reimbursement of the fees he paid to Attorney Blade for work he performed post-discharge; and reasonable attorneys' fees for the filing and prosecution of the motion to hold the BANK in contempt.

Only damages that flow from the violation are recoverable. The BANK committed no violation until June 6, 2008. So the harm suffered by the DEBTOR or resulting from actions taken before then was not caused by the violation and is not compensable. The only harm caused by the violation is the $4,500 paid by the DEBTOR pursuant to the June 6 settlement, and this sum is recoverable plus prejudgment interest in the amount of $316.40.[12]

The DEBTOR is also entitled to recover a reasonable attorney's fee. Reasonableness

_____

[12]Based upon the prime rate of 3.25% from January 1, 2009, to the date of judgment. *See Matter of Oil Spill by Amoco Cadiz*, 954 F.2d 1279, 1332 (7th Cir. 1992).

must be evaluated in light of the fact that contempt actions for violations of the discharge injunction are remedial in nature, not punitive.  The amount involved in a case and the result obtained are important factors.  The DEBTOR'S theory of the case, that the BANK'S entire post-discharge course of conduct was in violation of the discharge injunction, was largely rejected.  Limited relief was awarded and reasonableness of fees should be tied to the result actually achieved.  The Court determines that an attorney fee award of $3,000 is reasonable.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  A separate Order will be entered.

###